Good morning, and may it please the Court. My name is Solomon Shinerock. I represent the appellant in this case. The opinion below must be reversed, because it rested on the erroneous conclusion that what happened in this case was not torture. And that error in fact is nearly the entirety of the opinion, as I will explain. The defendants in this case tortured my client. There's no question that it was torture. Three branches of the federal government have so concluded. And the complaint amply alleges that, among other things, the defendants inflicted mock executions and 83 repetitions of waterboarding, which has been recognized as torture for decades in decisions of this Court. Our position is that torture is absolutely prohibited. The government can never engage in torture, and torture can never be the subject of valid government authority or authorization. The defendant's position is that they were just following orders. They were not. The complaint amply alleges that they were not, and the U.S. government has not appeared in this proceeding to say that they were or even register an interest in the case. Mr. Sheinrock, could Congress strip the Federal courts of jurisdiction to hear claims against anyone with respect to torture? Let's where there aren't other, again, in this situation where there are not at least clear constitutional, other constitutional rights at play. So could they strip jurisdiction from your alien tort statute claims with respect to anyone? Do they have the power to do that? They do not. That would be inconsistent with the Prohibition on Torture's status as a Jus Cogens norm that admits of no exception. The Federal government is not at liberty to authorize things that are prohibited by law. And a congressional Have you made that argument in this case? Again, you focused on agents, and I think that's what we're at least I'd like to focus on. But as a starting point, you say that this is about the question. Torture is prohibited, but our first question is, do we have jurisdiction to hear a claim arising under any of the prohibitions? Right. And I'll get there. My thesis here is that if you agree with me that what occurred is torture, that invalidates any of the jurisdictional defenses or arguments that the defendants have raised and that the lower court found. And I'll explain why. Okay. So I guess in trying to understand this, let's turn it around and now just focus on government officials and employees. I believe there's evidence there that suggests it would meet the standards that you would apply, saying that this is that they tortured. Again, taking the pleadings in parallel proceedings, there have been instances where government officials or employees in the various reports in the record here are alleged to have tortured. But in Hamad, at least, we said no jurisdiction under the same statute here. And no jurisdiction because they were agents. So that seems to run into your argument that allegations of torture must have a federal forum in our courts. I think, right. So the argument that I would raise is that there can be no valid government authorization to engage in torture. So no agent or government employee could be working within the scope of their valid authority. And if you look at the immunity doctrines that have been advanced by the defendants, they all require the court to ask the question, was the defendant acting within the scope of validly conferred authority? Did the defendant Let's focus on the statute first. The statute, and I just want to see how we read this statute, whether we're on the same page here. It deprives courts of jurisdiction over an action relating to detention, transfer, treatment, trial, conditions of confinement of an enemy combatant. Setting aside the agent piece, do you concede that these claims relate to the detention of your client? Yes. And I would concede the dispositive impact of that status on the case. But for what I'll call a just a bit of a toe in the door where I'd want to I would want to reserve the argument that, as I said, because of the Nusskogen status of the prohibition on torture, it can never be something that is that is lawfully applied by the U.S. government. So it doesn't. And so then we're left with just the question of agent. In other words, agent isn't I guess we'll see. There's some question about whether the statute be in relation to clause is modifying agent or action. But assume it sounds like you're assuming that it relates to action. It doesn't say anything about the scope. It just says agent. And again, it doesn't say employee. So employees who may have engaged in similar conduct claims against them. Let me know if I'm wrong, but it seems clear from the case law that Congress succeeded in stripping our jurisdiction over claims against the employees without an inquiry as to whether they're acting within the scope of their employment. Yeah, I think I think that reading is fair. I'm not sure it's a I'm not sure it's an appropriate conclusion, but I do think that in the narrow circumstances to which the M.C.A. applies, I think that reading is fair. I wouldn't know on the subject of agency, though, that very recent since the briefing, a recent decision in the southern district of Indiana has essentially made the point that the government cannot designate or authorize to an agent the power to commit an unlawful act. That case is Roman against McAfee. It's a December 2024 decision. And I think it supports my point, which is that there there is there is a basic principle of immunity that in order to get the benefit of immunity, a defendant must show that they're entitled to it. They must show that they were acting within the confines of the law. And because the M.C.A. is effectively an immunity statute, I would submit that when Congress passed it, it understood the limitations on immunity, and it intended that those limitations would also apply under the M.C.A. So for that reason, again, I come back to my principal point, which is that if you agree with me that what happened in this case is torture, these jurisdictional defenses cannot be invoked. Well, I guess the odd thing about the statute, and thank you for your patience with me. Your answers are helpful, is that this is Congress appeared to be adopting a kind of respondent superior and reverse, a kind of non respondeat inferior. I agree. And I think it's because perhaps one explanation would be that Congress understood that without this immunity that the U.S. or the C.I.A. or the supervising agents or employees or officials in the United States could be liable, could be attributed, because there was — because the contractors were agents, not — there's nothing within the scope. And often Congress will say within the scope of their agency, but there's nothing within the scope. They were agents. So if that's what they are trying to undo, why wouldn't the mere fact that they were agents for some purposes? Do you concede that they were agents for some purposes? These defendants in this case?  No. So the express authority, you rule out because it says independent contractor in the contracts? No, that's not it. I think a couple of things. Okay. You have to look — you do have to start with the contracts. And the contracts make clear that they provide no authorization to act on behalf of the United States government or deal with any third party. And that, under the common law, which the parties agree, applies to the agency analysis here. Under the common law, decisions of this Court, including the Whispersoft, Mills, and the Le'Veon — Fisher v. Le'Veon case, this Court has said that an essential characteristic of an agency is the power of the agent to commit his principle to business relationships with third parties. A party without this capacity to bind the principle is not an agent. And if you look at their contracts, nothing — Well, but that's the entire point of this MCA, is it not, to ensure that whatever understanding against — it could be that against a backdrop that they were in a position to bind, to confer respondeat superior liability upon their principle, that Congress wanted to undo that? Why — what about ratification? I mean, this was — your pleadings discussed that the CIA was — this was a CIA site. They were supervising. They were engaging in contracts and future agreements again and again and again. Why is there not implied authority or ratification of the conducted issue in your claims? So, they were telling CIA headquarters about some of what they were doing, and they were telling DOJ about some of what they planned to do. And they downplayed the severity of the torture of my client. So, they whitewashed those communications back to CIA headquarters. They whitewashed their plan to DOJ. We have in our supplemental excerpt of record an 18-page memo that records all of the assumptions and limitations that they told DOJ would apply to their interrogation. And the OLC itself concluded in a subsequent review that the waterboarding in particular was done in repetitions, in greater frequency, and in a manner that was different from what was set forth in the original 2002 OLC memo that they claim acted as a sort of authority for the conduct of the interrogations. So, our entire case is premised on the theory that they committed torture, and they did so in a way that went beyond the scope of any authority that they had. And I don't think that there's any basis to identify ratification of their conduct in a sense that would make them agents for MCA purposes. So, I see that my time is coming to a close. I just want to cover a couple of other points about the MCA analysis in particular. I think it's important to note that in this case, what the government did authorize happily is set forth in writing. And as I said before, you have to start the analysis from the contracts that they had. As alleged in paragraph 50 of our complaint, the contracts authorized psychological consultation to CTC in debriefing and interrogation operations. That's not what happened in this case. What the defendants did went far beyond the scope of their authority and exceeded longstanding boundaries of lawful interrogation, and that's plainly alleged. The district court was not at liberty to reject those allegations because they're not mere conclusions. The complaint goes into specific factual allegations about the conduct, and that conduct constitutes torture under the decisions of this court. With respect to the MCA finding in particular, the district court jettisoned that component of the agency analysis that speaks to the on behalf of the agency. It requires that the agent have the ability to impact the rights and duties of the principal. And again, I know you're short on time, but I want to hone in on that piece then. Yes, usually with agency analyses in order to determine an agent, those are usually decided on summary judgment because they're fact intensive. But we're dealing here with a jurisdictional statute where we don't have jurisdiction to reach those questions. And you have the obligation to establish jurisdiction in your pleadings. So how do we determine if you're asking for a fact specific inquiry into the scope of agency, assuming that's what the MCA requires? How do we do that when Congress has stripped the jurisdiction to do so from us and it only says agent? It doesn't discuss scope. I would submit that we've met our burden to establish jurisdiction through the allegations in the complaint, which established that they were not agents. If they want to rebut that on a jurisdictional Rule 12 motion, say that we are agents, in fact, it's their obligation to come forward with information. They did provide extrinsic evidence. It goes to the combatant status of my client. That's not something we argue with. They did not provide their contracts. And why? Because those contracts are incompatible with agency status. They're appended as Exhibit 4 to the motion for judicial notice, and I would commend them to you. I'll give you two minutes for rebuttal. Thank you, Your Honor. Thank you, Counsel. Good morning, Your Honors. Brian Pasman on behalf of the appellees, the defendants here, Dr. James Mitchell, Dr. John Bruce Jessen. I appreciate the time today. It seems to me that we need to start with the motion for judicial notice. We heard about the contracts just a moment ago. Of course, we oppose the Court's ability to look at those contracts at this point in time, not because we disavow that they are, in fact, the contracts, but simply because these were not items that were placed in front of the District Court. Well, let's focus on the pleadings, then, if that's so. Where in the pleadings do you think an agency relationship is established under the MCA? How have they pled themselves out of jurisdiction here? Well, I believe that it's based upon the extent of the control that the CIA employed with regard to what transpired here in connection with Mr. Zabita. As they've pled in the complaint, and there's an awful lot of allegations in there, it establishes how it was that the CIA came to my clients, what occurred once my clients were engaged by the CIA, how the CIA, in turn, then took the suggestions from my clients to the DOJ, and then what came back. And, of course, what came back was not all of the EITs being approved. Do we need to ask any question about the scope of agency? Are there any limits to the scope of agency under the MCA, or in this case? I actually think the answer to that is no, Your Honor. I believe the answer is no, and I listened intently to what Mr. Sheinrock said to you. But if there was going to be some sort of scope parameter that was going to be employed by Congress here, frankly, it should have been disclosed within the MCA. So where that leaves us is back with the restatement third of agency. So your clients could have murdered Mr. Zubedaya? Well, Your Honor, respectfully, again, if that was within the context of the agency that was granted by the CIA in this particular instance, then I think my answer is yes, although I recognize that's a very extreme example. Well, okay. What's the context, though? How far does that extend? An act, let's assume, otherwise unlawful killing, wrongful death suit, off-site? Well, Your Honor, again, here we're talking about a situation where we have specific facts in terms of what transpired, not a murder or something akin to that. But then we're back to asking whether it's within some sort of scope of agency, are we not? Well, I think we are, Your Honor, and that's fair. But once again, when we talk about the scope of agency under the MCA, it's the scope as established by the restatement third of agency. And there, there's two elements that are taken into account. Number one, has the principal asked the agent to do something? My word's not the way the restatement reads. And has the agent, in turn, agreed to do just that? And then was their control exercised? And I would suggest to you that in each of those particular elements, given the pleadings that we're looking at here, we need go no further than the pleadings. The answer is unequivocally yes. And during the course of your questioning of Mr. Shinerock, he mentioned this question of binding and whether it's necessary to be able to bind in order for there to be an agency. I would suggest to you that under the comments for the restatement third of agency, the answer to that question is no. And it's set forth in our briefing. But the reality is that to the extent that an agent with actual authority, which is what we believe the pleadings here manifest, exceeds that authority, then the remedy is if the principal is held accountable, the principal, in turn, can come back to the agent, and that's where the liability lies. It's not a question of liability as between the agent and the individual with whom he was trading. The comments to the restatement are very clear that it says sometimes the agency could simply be to negotiate, to obtain information. And I would suggest to you that that's similar to what we have. But I guess as soon as we begin limiting the scope of this agency, we have a complaint that alleges that the principal here said that the scope ended and that, again, the allegations are that once the contractors had gone beyond that scope, they not only exceeded the scope, they had arguably committed war crimes. Well, Your Honor, that turns a blind eye to what was happening on the ground. And respectfully, it harkens back to your question of ratification. This wasn't a situation, assuming you were even to consider the contracts, where it was the contracts and then nothing else is looked at. This was a situation, as pled by Mr. Zabaite in his complaint, where the CIA had people in the room while the interrogation was taking place. There was medical staff there. There were guards in the room. They monitored the situation. And then at the end of each and every day, there was a summary of what transpired. That was what was happening here. This wasn't a situation, for example, that was up in a different context, but where the government had no idea what was going on. They knew exactly what was going on here. In fact, at one point in time, my client sought to end the enhanced interrogations, and it was disallowed by CIA headquarters. So that manifests, among other things, that they were tuned in. They knew what was going on here. And so I would suggest to you there was undoubtedly a principal-agent relationship that occurred here. End of story. What do you make of the question that usually we don't resolve these questions on pleadings? So what are we to do with a jurisdictional statute that turns on agent status? Well, again, I think that you can get there based upon the pleadings that you have here, even if you don't usually resolve that on agency, because you're right. You have, to some degree, a little bit, excuse me, sir, a dilemma, where on the one hand, you're saying, well, how do we resolve this just on the pleadings? But on the other hand, you have the Congress having stepped in, and respectfully, based on the legislative history, among other things, to protect my very clients. So you have, on the one hand, no jurisdiction, and on the other hand, a situation where, arguably, you can't resolve that until later. And I would suggest to you that in this particular instance, there is more than enough, based upon what he pled, in his complaint, to get you there. We accept as true what he said in his complaint. And as the district court acknowledged, this was a facial challenge. Nothing outside of the complaint was looked at for purposes of the decision in the court below, and nothing needs to be looked at here to get you to the very same conclusion, which is that there is no jurisdiction, because these folks were agents, and that they acted within the scope of their agency. And if we look at it, Your Honor, if I may move to sort of a corollary piece of this, Mr. Biden needs some level of law in order to proceed with his ATS claim. Absent that, he doesn't have an ATS claim. So setting aside the extraterritorial issue associated with his ATS claim, which is, if you look at it through the focus perspective, all of this activity occurred overseas. He was interrogated overseas. None of it occurred in the United States. So we have a situation where, what does Mr. Zabida do in the face of that? He says, well, there's this acquiescence standard that can be applied under the ATS. Respectfully, to employ an acquiescence standard at this point in time would be to turn a blind eye to 30 years' worth of jurisprudence, including from this court, that says, if you don't have State action, if these folks did not act under color of law, there is no ATS claim. So he's got a bit of a dilemma here, candidly, and the district court saw it, and other courts have seen it. And it's a bit of a catch-22, based upon the interplay, on the one hand, where the MCA, the Military Commissions Act, has an agency situation. On the other hand, he doesn't have an ATS claim without that very same agency-type situation. Roberts. Back to the statute. Yes, sir. Do you — the question I had for you, your friend, the relating-to clause. Does the relating-to clause, as you understand it, modify the actions from which jurisdiction is stripped, or the agent relationship? You know, Your Honor, I haven't really spent a lot of time thinking about that, so I don't have a good answer. Well, forgive me, I have. So we're trying to figure out exactly what these words mean. Because I guess if it turns only on whether someone is an agent, I think you've been candid with respect to the scope of agency, well outside of any express authorization that your clients purported to exercise. What about the cook or the custodian at the black site, an agent of the United States, right? I would agree with that statement, yes, sir. And so if that person harmed a detainee, same rules, anything goes, simply because they've triggered the agent status? I think no, Your Honor, because in that situation, the question becomes, why were they there? So if it's a cook — Well, but that's exactly the plaintiff's question here. Why were they there? And he has alleged that what they weren't there to do is torture, and that came from the highest levels of our government. Well, getting back to the concept of torture, Your Honor, in the Padilla case — Waterboarding, for example. That's maybe the clearest example. Excessive, well beyond the guidelines established in the memo, if that controls. Well, Your Honor, once again, we get back to the questions of ratification and the like, where the CIA saw every bit of what was taking place here. And I recognize the allegation is that this occurred beyond the guidelines. But if there were — if it were murder, is that something that would have been ratified by the fact that if the CIA continued a business relationship with these contractors? Well, was the CIA watching when it transpired? Was it within the scope of that which these individuals were employed by the CIA to do? It seems to me the answers to those questions would drive the answer to your ultimate question here. And so, you know, plainly, they weren't hired to murder anybody. They were hired to interrogate somebody. I recognize that the allegations here are that they exceeded the bounds of that which the DOJ authorized. But once again, we get back to waterboarding, the most extreme of the EITs, of course, was authorized, as were all of the other things that transpired with respect to these individuals. And candidly, even if they weren't authorized — But confined simulated burial. Well, simulated burial, no, that was not one of them, Your Honor. You're 100 percent right with regard to that. Okay. But there are allegations of simulated burial. Why is that not outside the scope of agency for the MCA? Well, it brings us right back to the ratification concept that Your Honor talked about earlier. You know, they want to pin the scope of that which was authorized exclusively to that which was taken by the CIA as proposed techniques, put in front of the DOJ, and the DOJ in turn says, yes, these work, no, these don't work, the insect one, that didn't work, so on and so forth. But in this particular instance, they were there. They were in the room. They controlled the situation. That's why it matters in this particular instance. And so while I recognize it doesn't fall within the four corners of that which the DOJ said was okay and that was really at the core of Mr. Yu's case in Padilla, the fact of the matter is, is that the concept of torture has been thrown around an awful lot by Mr. Zabideh here. The techniques that were deployed on him in almost every instance were not torture based upon that which was approved by the DOJ. And with respect to those couple that may have exceeded those very bounds, Your Honor, the CIA was right there to say nothing, nothing to contravene. You shouldn't have done that. Absolutely nothing. So in that case, the CIA would have ratified acts that they allege are torture. Absolutely. That's exactly. And if it did happen as they say it happened and that's a whole different issue, then yes, absolutely. That is my client's position on that subject. And this particular statute, again, it talks about, at least in its legislative history, why this came about. It came about because of my clients. The DOJ memo. Well, the DOJ memo specifically identified that it was going to be my clients that served as the interrogators here. That's actual authority. There's perhaps not a better manifestation of actual authority than they were identified in the very memo from the DOJ in terms of that which was going to transpire on a going forward basis. And once again, we're talking here about an enemy combatant. And I'm not suggesting it's a good idea for torture of an enemy combatant. But this is not a U.S. citizen, so cases like Hamdi and a guy, this was the war on terror, and the CIA, and it came down from upon high, including from Vice President Dick Cheney. We have to figure out what's coming next. And that's what my clients did. And now what they seek to do is have them hold the bag for it. And there's all kinds of different basis from which this Court could affirm what the district court did. It's not just the MCA. It's derivative sovereign immunity. It's the political question doctrine. It's all detailed in the, I apologize, the many pages of briefing that we provided to you. And it's not my point today to continue with that. So unless you have any further questions, I see my time is up. Thank you, Counsel. Thank you. I'll be very brief, and I thank the Court for its indulgence in the extra two minutes. I want to come back to this idea of ratification. I know you've been thinking hard about it, Judge Johnstone. Ratification was not argued below. I don't think it was argued even on the briefing here. It might create, after the fact, vicarious liability. It does not retroactively change the status of the defendants from independent contractor to agent. And it, therefore, should not impact the agency analysis. Another ---- On the facts, do you contest any of the facts that the CIA was actively supervising throughout, was at least there, set aside the legal import of that? We concede that there were CIA representatives there. But the fact arguments that my colleague just made are contrary to what was alleged in the complaint. That's unacceptable on a Rule 12 disposition. So ---- But that's whether they controlled. The factual dispute. Right. And whether they controlled, I think, is answered, at least in part, by reference to the OLC memo that they're holding up as authority. That's part of the supplemental excerpts of record. Page 1 of that document says that the only people with access to the detainee during the interrogations are going to be these two contractors. So this ---- And we allege in the complaint, as part of our acquiescence argument, right, that the CIA was there, there were government representatives there, they knew what was going on, they failed to stop it. How can ---- How can I ask you, the Federal Government ratify acts of torture which are prohibited as a use Kogan's form? And I think another important reference is that Convention Against Torture, to which we are a party, requires states' parties to provide a forum for remedies of its violations and to strip jurisdiction, as my colleagues have proposed, would be incompatible with our commitment. All right. Thank you, Counsel. Thank you to both of you for your briefing and your argument. This matter is submitted and this particular panel is adjourned. It's been a great sitting with you guys.
judges: OWENS, VANDYKE, JOHNSTONE